IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| OCAL RAY SMITH, II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 7:19-cv-00671 |
| | ) | |
| APPALACHIAN POWER COMPANY, | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Ocal Smith II, formerly a line mechanic for Appalachian Power Company (APCO), has sued APCO for interference, discrimination, and retaliation under the Family Medical Leave Act (FMLA), failure to accommodate, discrimination, and retaliation under the Americans with Disabilities Act (ADA), discrimination and retaliation under Virginia's whistleblower law, Virginia Code § 40.1-51.2:1, and both negligent and intentional infliction of emotional distress. APCO moves for summary judgment, to dismiss the whistleblower claim for lack of jurisdiction, and to strike an affidavit submitted by Smith in opposition to APCO's summary-judgment motion. (Dkt. Nos. 30, 34.) The court held a hearing on the summary judgment motion (Dkt. No. 39) and a separate hearing on the motions to dismiss and to strike (Dkt. No. 40). Trial in this matter is scheduled to commence on May 5, 2021.

For the reasons stated below, the court will grant APCO's motions to dismiss and for summary judgment. The motion to strike will be denied as moot. The court will issue an appropriate order dismissing this case.

I.  BACKGROUND

**A.  APCO**

APCO is a wholly owned subsidiary of American Electric Power Service Corporation

(AEP), a public utility holding company that engages in the business of generation, transition, and

distribution of electricity.[1]  APCO generates and distributes electricity across western Virginia and

southern West Virginia.

APCO's Distribution Operations are organized by districts.  The Christiansburg District

includes Service Centers in Christiansburg, Pulaski, Wytheville, Woodlawn, and Bluefield, each of

which maintains a Service Center to which line mechanics are assigned.  Smith began in

Christiansburg, but he later transferred to Pulaski.  Pulaski line mechanics reported to Line Crew

Supervisors (LCSs) David Williams and Wayne Armbrister.  The LCSs reported to Glenn Edwards,

the Distribution Systems Supervisor (DSS) for Pulaski and Wytheville.  Edwards reported to

Christiansburg District Manager of Distribution Systems (MDS) Mike Wilson.  Wilson reported to

Vice President of Distribution Operations Phil Wright until November 2018 when he began

reporting to Scott Chambers, who reported to Wright.  Wright reported to APCO President Charles

Patton and then Chris Beam, who succeeded Patton in January 2017.

**B.  Line Mechanic Work**

Smith started work for APCO in 2002 as a line mechanic in Christiansburg.  Line mechanics

construct and maintain the lines, poles, and systems that deliver electricity to customers.  Essential

line mechanic functions include carrying up to 75 pounds, climbing poles, and conducting pole-top

rescues.  It is "physically demanding, heavy, heavy work."  (Smith Dep. 159, Dkt. No. 31-5.)  Line

---

[1] AEP was originally named as a defendant but was dismissed by stipulation on February 19, 2020.  (Dkt. No. 14.)

mechanics work in crews consisting of two to four employees.  Line mechanic work is 24/7, 365

days a year, and they are on call to respond to outages and other emergencies on an overtime basis.

**C. APCO Employment Practices**

APCO maintains EEO, harassment, FMLA, and ADA accommodations policies.  These

policies are in the Employee Handbook and can be found on the AEP intranet.

At any given time, there are literally hundreds of AEP employees on medical leave.  APCO

works with disabled employees to get them back to work quickly and safely.  AEP has a Recovery

Center that manages medical treatment and rehabilitation to safely return employees to work.

AEP has a Safety Department and issues employees a Safety & Health Manual.  Wright, VP

of Distribution Operations, described APCO's safety culture:

> I think every employee, the 950 employees that were in my
> organization, if you ask them, they've heard me more than one time say
> that safety is paramount.  It is imperative that we build safety into
> everything that we do, and that if something . . . does not look right or
> employees don't understand, they not only have a responsibility but
> they have an obligation to stop that job so that that work can be done
> safely, and then if it can't be done in a safe manner, we won't do it.  We
> will find another way to get things done.

(Wright Dep. 34–35, Dkt. No. 31-2.)  APCO has "All Can Stop Job" and "If you see something, say

something" policies.  Any APCO employee can stop a job until safety concerns are addressed.

When employees witness anything unsafe, they are expected to "speak up when they immediately

see it, and then report what happened."  (Edwards Dep. 18, Dkt. No. 31-3.)  APCO holds weekly

safety communications and regularly schedules safety trainings and meetings.  One such example is

"Journey to Zero Harm," mandatory training required of all personnel.

Employees with concerns have a variety of reporting avenues, including through the Human

Resources Department, which consists of approximately 130 employees.  In addition, employees

can report concerns anonymously through Ethics and Compliance (E&C, also known as the

Concerns Line).  Beam explained this process:

> We encourage folks if they have a concern to let us know.  We've built
> the Concerns Line around that and a whole organization around making
> folks feel comfortable, to bring a concern, One, and then Two, ideally,
> to have an independent group be able to either vet out the concern and
> find a conclusion or to determine that maybe it is not a real concern at
> all.

(Beam Dep. 12–13, Dkt. No. 31-9.)

**D.  Transfer to Pulaski, Complaints About Other Employees**

While on extended medical leave in 2009, Smith had an affair with the spouse of a fellow

line mechanic, Mike Hobbs.  (Wilson Decl. ¶ 7, Dkt. No. 31-1.)  After Hobbs learned of the affair,

he physically "beat up" Smith.  (*Id.*)  Smith pressed assault and battery charges, Hobbs was

arrested, and the court ruled Hobbs and Smith could have no contact for one year.  When Smith

returned from medical leave in July of 2009, Wilson transferred him to Pulaski.

In 2013, Smith complained to Wilson that an employee, whom Smith believed to be Hobbs,

made menacing comments to his girlfriend (now wife, Crystal Smith)—"you tell Bubba we said

'hello.'"  (Wilson Decl. ¶ 13.)  Wilson investigated and found Hobbs was in Gatlinburg on a family

vacation on the date of the alleged incident.

Later in 2013, Smith complained to Wilson that a Southern States worker had said, "I hear

Mike Hobbs beat the hell out of you, Bubba and he said he was going to do it again as soon as he

could."  (Wilson Decl. ¶ 14; Smith Dep. 84.)  Hobbs allegedly gave Smith "the finger" every time

they passed on the road, and Smith feared Hobbs was going to beat him up again.  Wilson told

Smith that APCO would not tolerate any acts of violence, but he was unable to substantiate any of

Smith's claims.

On February 26, 2014, Smith complained to Wilson that he thought fellow employees had caused power outages at his home and were "out to get him."  (Wilson Decl. ¶ 15.)  Smith created a map to describe the scheme.  Wilson was unable to substantiate this claim.

### E.  Complaints About Theft

In June 2012, Smith reported that "there is a lot of thieving going on in Pulaski."  (Wilson Decl. ¶ 12.)  Smith claimed that someone stole a trailer hitch for a truck.  When Wilson went to investigate, he located the misplaced trailer hitch and found no evidence of thieving.

### F.  Verbal Warning in May of 2014

APCO uses an overtime call-out system called ARCOS.  When APCO needs employees after hours, ARCOS automatically calls them in rotation.  ARCOS automatically tracks call-out opportunities, acceptances, refusals, and failures to respond without inquiring into the reasons.

In May 2014, Smith received a warning for poor call-out response.  Smith filed a formal grievance, claiming that one of his "refusals" was due to "six feet of snow in the drifts up and down my road," the "refusal" should be removed from his call-out report, and management had removed refusals from others' call-out reports, but not his.  (Wilson Decl. ¶ 16; Smith Dep. 98, 100–01.)  In fact, fifty percent of the "refusal" corrections benefited Smith.  (*Id.*)  Smith's grievance was denied.

### G.  Smith Complains to APCO President Patton

After Smith's grievance was denied, he contacted APCO President Patton, making several complaints.  Patton scheduled a meeting with Smith, Wilson, and HR representative Doug Hoosier on August 21, 2014.  Without management's knowledge, Smith invited other line mechanics to attend the meeting.  Many of Smith's complaints revolved around ARCOS call-out issues, the same issues he had raised in his grievance.  Smith also brought up a couple of jobs he thought were unsafe, one involving a 20,000 pound fuel tank he claimed swung over employees' heads (the "Case

Knife Road" issue) and another involved "hanging switches" in a location Smith thought was unsafe (the "MacGill Village" or "Peppers Ferry Road" issue).  (Wilson Decl. ¶¶ 17, 20; Smith Dep. 104, 111–12.)

After the meeting, Patton told Wilson it appeared that there were "guys out to get" supervision, that Wilson should view this as a coaching opportunity, develop a path forward, and constructively put the issues to rest.  (Wilson Decl. ¶ 18.)  Safety was to be emphasized.  (*Id.*) Wright directed Wilson to investigate the issues and prepare an action plan.  Hoosier and Wilson followed up with Smith to discuss his concerns.  Smith again mentioned the Case Knife Road and Peppers Ferry Road jobs and continued to complain about ARCOS.  Wilson and Hoosier investigated and determined that Smith had greatly exaggerated the safety issues at Peppers Ferry Road.  Similarly, Wilson's investigation into the Case Knife Road issue revealed the tank had been 30 feet away from employees and no one on the job raised any concerns with the situation at the time.  Wilson provided Wright and Patton with the results of his investigations and an Action Plan. Patton, Edwards, Wright, and Wilson met with the same group of employees on October 30, 2014, to discuss the issues and their findings.  Wilson also met with other employees to discuss the issues that were raised.

**H.  Smith Complains about LCS DUI Arrest in August of 2015**

Smith learned during the summer of 2015 that LCS Stacy Hardin had been arrested for DUI. Smith reported this to management.  On August 20, 2015, Wilson met with Hardin, who admitted the DUI arrest and a brief license suspension.  With Wilson's approval, Edwards issued a three-day suspension to Hardin.

**I.  Smith on Medical Leave in 2015–16**

On November 30, 2015, Smith went on extended medical leave related to a shoulder injury.

Smith was approved for long term disability (LTD) benefits after exhausting his twelve weeks of FMLA and his six months of paid sick leave.  While on LTD, Smith claimed he could return to "light duty" with a twenty-pound lifting restriction.  However, Smith could not satisfy the line mechanic job requirements of pole climbing, pole top rescue, and the 75-pound lifting requirement. Smith was not qualified for any vacancies, so he remained on leave.  As Wright explained, "we typically don't just move people into other positions without having a vacancy, and we would have to have an opening for him to move into another position."  (Wright Dep. 65.)

During his time on medical leave and in the wake thereof, Smith lodged several complaints.

### 1.  Smith complains to Wright

On or around July 14, 2016, Smith wrote to Wright complaining about not being provided light duty work, citing examples of other employees he claimed had been afforded light duty. Smith also complained about not being reassigned to the Line School and pointed to the fact that one of the head instructors there had a prosthetic limb.  Wright asked Wilson to investigate Smith's complaints.

On July 29, 2016, Wilson sent Wright a summary of the other situations.  One individual (Bilbrey) had been fully released to work and was in a "work hardening" program, another (White) had burned his leg in a motorcycle accident but was fully released and relieved of climbing for only a short period, and the third individual (Strock) had a different job that he could fully perform despite his injury.  Wilson also pointed out that Smith had not actually been released to light duty. Wright responded to Smith by email on August 16, 2016, informing him that he "had physical limitations that were so restrictive that they ruled out your ability to perform any line mechanic duties, including supporting the Distribution Line Training Center."  (Wilson Decl. ¶ 29; Smith Dep. 136, Dep. Ex. 9.)

### 2. Smith complains to Carol Wakely

On September 14, 2016, Smith lodged a complaint with Carol Wakely in the Recovery Center. Smith complained again about light duty and safety issues, and he claimed Larry Anderson, the Safety Coordinator, had shared information about Smith's return to work with other employees. Wakely directed Smith to contact E&C.

### 3. Smith complains to E&C

Smith contacted E&C that same day and complained to Investigator Brad Murphy that Anderson inappropriately shared information about his return to work. Anderson denied sharing confidential information or making the comments attributed to him. Wilson was aware of the issue and, at his direction, Edwards instructed Anderson to avoid discussions about employees on medical leave to avoid future misunderstandings. Murphy got back to Smith to let him know the situation had been addressed and closed the investigation. Smith testified there was nothing more he wanted to be done in response to his complaint.

### 4. Wilson arranges a light duty assignment in September of 2016

Later in September 2016, Wilson and Edwards identified a temporary Meter Revenue Operations (MRO) assignment in Bluefield that Smith could perform despite his injury. On September 23, 2016, Wilson met with Smith to discuss the assignment, which involved driving the area with a meter scanning device and hanging tags at various addresses. Wilson emphasized that Smith must work safely and not do anything that violated his restrictions. Wilson also arranged during this time for Smith to work in the Woodlawn area to assist with MRO functions to fill a temporary vacancy. Smith was "pleased with" and "enjoyed" the MRO assignments. (Wilson Decl. ¶ 31; Smith Dep. 147.)

### 5. Smith complains about an employee appreciation biscuit

After a year of leave, Smith was released to work on November 28, 2016.  On December 5, 2016, Smith called Edwards to inquire about "Pulaski Employee Appreciation Week."  (Smith Dep. 151.)  Edwards told Smith, "I will save you a biscuit."  (*Id.*)  Smith told Edwards "just forget it, Glenn, as you know I'm diabetic and I can't eat biscuits.  I will just forget it."  (*Id.* at 152.)  Smith felt Edwards' "save him a biscuit" comment was discriminatory.  (*Id.* at 151–52.)

After returning from extended leave, Smith was gradually reintroduced to line mechanic work through a work hardening program that included the requirement that he satisfy a pole-top rescue simulation and certify other job requirements.  By December 21, 2016, Smith was cleared for full line mechanic duty.

### 6. Smith complains to Edwards about Volvo job

On January 11, 2017, Smith complained to Edwards about what came to be known as the "Volvo job" that happened years before.  (Smith Dep. 156.)[2]  Smith "absolutely" was "still upset about that Volvo job in January of 2017 to the point that he complained to Glenn about it" years later.  (*Id*.)

## J.  Smith Complains to Beam

On February 2, 2017, Smith sent an email "with a heavy heart and a troubled mind" to Beam, who had just succeeded Patton as APCO President in January of 2017.  (Wilson Decl. ¶ 34, Ex. 33; Smith Dep. 197–98, Ex. 13.)  Smith raised the same concerns previously addressed by Patton and Wright.  Beam sought input from Wright and Patton and reached out to HR, E&C, and Safety because of the "serious nature of the claims and that this is the second time you are bringing

---

[2]  The record is unclear what exactly transpired in relation to the "Volvo job."

them to our attention."  (Wilson Decl. ¶ 35, Ex. 35; Beam Dep. 49–50.)  "Because of his allegation

that they were breaking lifesaving rules, and we felt like that that was so serious that it would be an

ethics violation and a compliance violation, so we wanted to turn it over to a third party to

investigate to make sure that we got an unbiased evaluation of the situation."  (Wright Dep. 93.)

Smith mentioned specific safety issues including once again the Volvo job, as well as an

incident involving Armbrister concerning work area protection (WAP) issues.  David Robinson,

Safety Manager, wrote up an investigation report.  Armbrister was issued a warning about the WAP

issue even though Smith had not expressed any concerns at the time.  Armbrister was surprised

when the issue came up, and he testified, "I would hope that he would come to me first, but he

never did."  (Armbrister Dep. 34, Dkt. No. 31-8.)[3]

Separately, E&C was "unable to find evidence that the supervisor retaliated against the

employee for reporting his/her concerns."  (Wilson Decl. ¶ 37, Ex. 40.)  E&C "found that the

employee reacted negatively to some of the supervisor's decisions and perceived malicious motives

from the supervisor about the decisions."  (*Id.*)  However, there were "no such motives from the

supervisor" and the decisions "appeared to be made for the right reasons and based on sound logic."

(*Id.*)

Following the investigation, Beam met by phone with Murphy (E&C), Robinson (Safety),

and Wright "to kind of talk together through it, make sure we didn't miss anything, and make sure

we truly understood what the investigation had found out."  (Beam Dep. 55.)  Then, on June 21,

2017, Beam, Wright, Edwards, and Wilson met with Smith to discuss his concerns and the results of

the investigations.  Beam asked Smith, "Can you move on?"  (Wilson Decl. ¶ 39.)  Smith replied,

---

[3] Smith secretly recorded conversations with Armbrister and other APCO employees and secretly took pictures of their work areas.  (Armbrister Dep. 36.)

"Yes, absolutely.  I have put this behind me."  (*Id.*)  Afterwards, Smith came back to Wilson's office and told him, "I just wanted to let you know I'm sorry about all of that . . . . I just could not let it go."  (Smith Dep. 214–15; Wilson Decl. ¶ 40.)  Wilson told him, "This has got to stop." (Smith Dep. 216.)  According to Smith, "what Chris Beam and Mike were telling me was that you've got to let it go, you've got to move on."  (*Id.* at 219, 224–25.)

Even so, Smith admitted that he continued "raising issues that he had raised in the past . . . the Volvo job for example . . . and the work area protection issue.  (Smith Dep. 219.)  Smith admitted he brought those jobs up "repeatedly" and admitted he "had discussed many of these issues with other people beforehand."  (Pl. Dep. 225–26.)

## K.  Smith Complains About Bucket Truck Issue

On July 27, 2017, Edwards informed Wilson of a safety issue concerning a bucket that, according to Smith, was difficult to get in and out of.  Edwards told Smith he did not have to use the bucket that day, and the truck was taken out of service.

## L.  Smith Praised for "Good Catch" on Safety Issue

When an APCO employee catches something that could have been hazardous before the hazard actually occurs, it is reported as a "good catch."  (Edwards Dep. 28.)  From time to time, Smith caught safety issues before they became a hazard, and he was recognized for the "good catch."  (*Id.* at 39–40.)  On August 3, 2017, for example, Edwards sent Wilson an email praising Smith for raising a safety issue involving a rotten pole.

## M.  VOSH Investigation of Electrical Flash

In December 2017, a Virginia Occupational Safety and Health Program (VOSH) investigator commenced an investigation into an electrical flash that had occurred at Miller's Creek Road where APCO's Wytheville crew had been working in September 2017.  No one had been

injured, but an anonymous "concerned citizen" had reached out to the VOSH investigator a couple of months after the job.  (Wilson Decl. ¶ 43.)  The investigation was closed on May 23, 2018, with several citations.  (April Thornton Deposition (Thornton Dep.) 42, Dkt. No. 31-11.)

Smith testified that he was the confidential informant.  (Smith Dep. 28–29.)  At no time during his employment, however, did any APCO manager believe that Smith had lodged the complaint because he did not work in that area and he was not on that job.  (Wilson Decl. ¶ 43; Franklin Scott Chambers Deposition (Chambers Dep.) 15–16, 18, Dkt. No. 31-7; Edwards Dep. 88.)  Smith never told Edwards that he was the anonymous complainant, and Edwards never thought Smith had made the report.  (Edwards Dep. 91–92.)  The VOSH investigator also did not disclose to APCO that Smith had been the anonymous informant, explaining "even if his name were on the complaint, I would not disclose it.  I am not allowed to in the State of Virginia."  (Thornton Dep. 41–42.)  The investigator testified she had no record or recollection of any subsequent safety complaint by Smith.

**N.  Smith and His Wife Submit Repetitive Complaint Letters**

On July 10, 2018, Smith went on extended medical leave again.  On September 9, 2018, Smith submitted a Certificate of Disability indicating he needed to remain off work for a torn rotator cuff on his shoulder.  He eventually had surgery on that shoulder.  Shortly before taking medical leave and continuing through the duration of the leave, Smith and his wife submitted "numerous complaints that consumed hundreds of hours of people's time."  (Wright Dep. 21.)

**1.  Akins receives first anonymous letter**

In June 2018, Smith received a warning because he missed an ARCOS call-out.  Soon after, AEP's CEO, Nick Akins, received an anonymous letter on June 12, 2018, entitled "Working Dead" from "AEP Employee Christiansburg District," who management believed (and later confirmed) to

be Smith.  (Wilson Decl. ¶ 45; Smith Dep. 226; Crystal Smith Deposition (C. Smith Dep.) 33, 37,

Dkt. No. 31-10.)  Smith's anonymous letter echoed previous complaints about safety becoming "too

expensive," "short-cutting" safety, managers turning a "blind eye," faster work pace with less

safety, getting labeled a "troublemaker" by the "click" (meaning clique), applying for jobs and not

being granted interviews, extracurricular activities with bosses (referencing Justin Wright and

Kenneth Belton being fishing buddies), commuting time rules violations and threats (referencing

APCO employee Todd Edwards allegedly living outside the required commuting distance and that

Smith was "threatened" about that issue, "corruption," and management making fun of disabled

people (a reference to Todd Edwards impersonating a short person on Facebook).  (Smith Dep.

162–70, Ex. 21.)

### 2.  Akins receives second anonymous letter on July 3, 2018

On July 3, 2018, Akins received another anonymous letter, which APCO again concluded,

based on the language and allegations, was from Smith.  The letter included more specific

accusations against Todd Edwards, an APCO LCS in Woodlawn (a different area than Pulaski, who

was mentioned in the first letter as making fun of short people.  The letter included photographs of

Edwards "making fun of midgets and short people on his Facebook page for the world to see."

(Wilson Decl. ¶ 46, Ex. 46; Smith Dep. 171–75.)  The letter also made false accusations about

Edwards' commuting distance and home address.  Further, Smith included information about Todd

Edwards' political affiliation and family members.

Wilson investigated and verified that Edwards currently lived within 30 minutes of his

Service Center, contrary to Smith's accusation.  On July 12, 2018, Belton and Wilson met with

Edwards about the pictures from his Facebook account.  Edwards provided an explanation but

agreed to remove them from social media.  He also agreed that he would not post photos with

company logos to avoid the potential for misrepresentation.

### 3. Akins receives third anonymous letter on August 3, 2018

On August 3, 2018, Akins received a third anonymous letter, which APCO again correctly believed was authored by Smith.  Smith once again alleged "conflicts of interest," the clique, and "corruption" in the Christiansburg District.  (Wilson Decl. ¶ 49; Smith Dep. 245.)  Among other things, the letter targeted Wright's "fishing buddy" relationship with Belton, whom he called "Pops" allegedly as some form of "in-house corruption."  (Smith Dep. 245–54.)  Furthermore, Smith falsely accused Belton of purchasing land with inside information, knowing a substation was planned for the property.  In addition, Smith's letter discussed the Miller's Creek Road flash incident, which had been addressed the year before in an OSHA investigation.  The letter also included attachments, including Facebook images and online research.

### 4. Smith complains to HR about Belton calling Smith a "shit stirrer"

Smith's complaints were getting back to the individuals he was targeting, and many were not happy about it.  On August 27, 2018, Scott Iroler told Smith that Belton had said, "I'm sick of this shit, I'm getting tired of being accused of shit I didn't do, and I know you are friends with Bubba Smith and he's nothing but a shit stirrer."  (Smith Dep. 191–92.)  Smith acknowledges that it was possible Belton was upset Smith had falsely accused Belton of using insider knowledge to purchase a piece of land.  (Smith Dep. 191.)  While on leave, Smith called Elizabeth Testerman in HR two months later, on October 24, 2018, to complain about Belton's "shit stirrer" remark. (Smith Dep. 196–97.)

### 5. Smith remains on leave

On December 3, 2018, Smith indicated that his doctor had released him to work with a ten-pound lifting restriction.  Smith could not return to line mechanic work with that restriction.  Wilson

checked with Harry Grubb to see if there was any need for additional MRO assistance, like Smith had done previously, but there was no such need at that time due to weather, disconnects, and new Automated Meter Infrastructure (AMI) technology.  Edwards notified the Recovery Center that there was no available light duty work.  Although no light duty work was available, Smith was able to continue on paid leave.

By December 4, 2018, Chambers had assumed his position as Director of Operations. Wilson made Chambers aware of the overall situation with Smith at that time.

### 6.  Akins receives letter from Crystal Smith

On December 28, 2018, Akins received a lengthy letter from Mrs. Smith, plaintiff's wife. Mrs. Smith raised the same issues previously raised by her husband, and which were previously investigated, over the course of several years, including the bucket platform issue, light duty issues, the Volvo job, the 2014 ARCOS issues, the Hardin DUI, and the Employee Appreciation Day biscuit.  Mrs. Smith also lodged personal attacks against numerous APCO employees, including Belton, Todd Edwards, Tracy Tuck (the one-armed Line School instructor), and various family members of Glenn Edwards.  Mrs. Smith attached Facebook photographs and internet research, in some cases the same images her husband had enclosed in previous anonymous letters.

Mrs. Smith admitted that most of the allegations in this letter were based on hearsay, and she had no personal knowledge of the allegations, except for certain Facebook photos and online research.  Wilson, E&C, Safety, and HR investigated the allegations in the letter.

### 7.  Akins receives a second letter from Crystal Smith

Soon after investigating the first letter, Akins received another letter from Mrs. Smith on February 4, 2019.  This letter was 45 pages long.  It raised the same issues previously raised by the plaintiff over several years, including in his anonymous letters.  Mrs. Smith also leveled some of the

same, as well as additional, personal attacks against APCO employees.  She admitted once again to having no personal knowledge of the allegations.  Wright sent the letter to Wilson for investigation on February 6, 2019, with a sarcastic comment, "FYI, enjoy."  (Wright Dep. 73–74.)  Wright explained the comment as follows:

> Well, when we get those letters, . . . they are full of accusations and pictures and Facebook information and on and on and on, and if I recall correctly, this particular letter was 42 pages long, and . . . so I sent it back down the line of leadership, and my point is, we got to go through that letter point by point for 42 pages and evaluate each one of those complaints, and my point was, and it's probably a little bit more sarcasm in that, is that it takes numerous hours to go through all of that, and for Mike, Scott, and other that have had to be involved, they've had to look at each one of those complaints, follow up, and then report back on whether any of that was true, and if we found that any of it was, then we had to address it, so my point was, here is some more work for you guys to do.

(*Id.*)

It was determined that Mrs. Smith's letter raised four "new" issues.  (Wilson Decl. ¶ 57.) Wilson prepared an updated investigation summary reflecting his investigation into the four new issues raised in Mrs. Smiths' letter, as well as the previous letter.  Chambers recalled, "many, many of us, were extremely frustrated with Mr. Smith and the time that . . . everyone spent investigating all of his allegations and just continuing to deal with Mr. Smith who would not accept facts and would not let anything go."  (Chambers Dep. 30.)

**O.  In February/March 2019, APCO Leadership Unanimously Agree to Terminate Smith's Employment**

On February 19, 2019, E&C Director Gina Mazzei-Smith, Jaime Beckelhimer from Labor Relations, Wright, Chambers, and Wilson participated in a telephone conference with a representative from APCO's Legal Department.  Those present agreed that Smith and his wife's repeated accusations created a very disruptive work environment.  Some employees who were

targets of the accusations had requested a transfer to other work locations and/or were seeking legal

representation.  "[H]e continued to bring up the same issues over and over."  (Wright Dep. 96.)

Chambers described it as "[i]nvestigation after investigation of the same issue[s], and Mr. Smith

could not take a response and he could not let go of anything."  (Chambers Dep. 13.)  Wright

further recalled that Smith

> continued to send out letters alleging all of these issues that were going
> on, sending letters to Mr. Akins, and he just continued to the point that
> we were not going to allow that kind of activity to continue.  We had
> to have a work group that were focused on doing their jobs safely, first
> and foremost, and we didn't need to have that kind of strife within the
> work group where people were not focused on their jobs and more
> focused on what was going to be alleged next.

(Wright Dep. 79.)  Chambers described Smith as "an employee that caused a significant amount of

heartache and grief and disruption into our work force."  (Chambers Dep. 13.)  "Every complaint,

every allegation that he made was fully investigated and independently investigated, and what we

found was . . . there was nothing there."  (*Id.* at 15.)

Beam recalled that Smith

> Would make complaints that we would investigate.  We would use
> Ethics or HR of Safety to do the investigation, so an independent third
> party group, and they would investigate all of his claims and the result
> would be that they were unsubstantiated.  We would explain the results
> of the investigation, and clearly, from our belief, he was never satisfied
> with that answer, and so you would get the same complaint again, over
> and over and over again, and it came to the point that then he was
> sending in letters that were then taking actually shots at other
> employees within the company, and so we would investigate that, and
> it became a very contentious work environment where other employees
> were then getting legal counsel to protect themselves.

(Beam Dep. 16.)

Every decision maker on the February 19, 2019 call agreed that Smith's behavior was

creating a hostile work environment and unanimously agreed his employment should be terminated.

Wilson recalled:

> The reason so many people from so many aspects of the organization were involved was to guarantee that all actions taken with regard to his employment were for legitimate non-discriminatory and non-retaliatory reasons.  We weren't blind to the possibility that Smith might file an EEOC charge or an NLRB charge or even a lawsuit.  To the contrary, it was expected.  If any of us had wanted to retaliate against Smith for medical issues, leaves of absence, safety complaints, union activity or anything else he is now claiming, there were ample opportunities for such retaliation many years before.  But that's not what our decision was about.

(Wilson Decl. ¶ 67.)  Chambers said much the same:

> Well, there is a lot of folks involved in those decision, and we get our HR department involved; we get our labor relations department involved.  We get AEP legal to look at everything.  I mean, there is a huge number of people that are involved in making those decisions when we go to terminate.  That is a very serious issue that we take very seriously.  We have a lot of training and everything invested into an employee and we want to make sure that we're doing the right thing, so it is a joint decision.

(Chamber Dep. 33.)

At this time, the decision had been made to terminate, but the issue of timing was "yet to be determined."  (*Id.* at 68.)  The plan was to "have further discussions with HR, legal, and labor relations to determine whether we separate during his LTD time off or his first day back" in mid-March of 2019.  (*Id.* at 67–68.)  Edwards, a target of Smith in his letters, was not involved in the decision to terminate.  (Edwards Dep. 75.)

**1. Akins receives letter from Smith on February 25, 2019**

This letter was characterized as more of the same.  (Wilson Decl. ¶ 60; Smith Dep. 329–33.)

**2. APCO concludes investigation**

On February 20, 2019, Wilson summarized the Smith situation and attached an updated timeline, as well as copies of Mrs. Smith's letters and his response to her many claims and other

issues.  In addition, because Smith's latest letter alleged that Williams had witnessed the "harassment and humiliation" Smith had received from Edwards, Wilson met with Williams to get his perspective.  (Wilson Decl. ¶¶ 60–61.)  Of note, Williams told Wilson that Smith had not been forced to work unsafely and was not being targeted.  (Wilson Decl. ¶ 61.)  Williams was familiar with the background for some of Smith's claims, but he told Wilson the actual circumstances were not as Smith portrayed them.  Williams told Wilson that Smith would "never be happy" and that "this had been going on too long."  (*Id.*)  Williams said that Smith "really brings the drama with him."  (*Id.*, Ex. 65.)

### 3.  APCO terminates Smith on March 15, 2019

On March 14, 2019, Chambers mailed a termination letter to Smith.  The following morning, Chambers and APCO HR Manager Deb Tygrett called Smith and informed him that his employment was terminated.  Smith was told that he "was no longer welcome on our property, to work on our property" because "he was a disruptive force in our company, and we no longer wanted him around any of our company employees or our company facilities."  (Chambers Dep. 34, 59; Edwards Dep. 81.)  Without Chambers' knowledge, Smith secretly recorded the telephone call.  Chambers felt the secret recording was "unethical" and "devious," but he stands behind what he said in the call, which followed a script prepared in advance by Chambers.  (Chambers Dep. 37–38, 70–71.)

### P.  Procedural Background

Smith filed a safety whistleblower complaint with the Virginia Department of Labor and Industry (VA DOLI) on April 30, 2019.  He filed a charge with the EEOC on May 23, 2019.  Smith received a right to sue letter from the EEOC on July 16, 2019.  This action was filed in federal court on October 4, 2019.  (Dkt. No. 1.)

After APCO filed its motion for summary judgment on February 14, 2021, Smith received a

right to sue/determination letter from VA DOLI on February 24, 2021.  (Dkt. No. 33-13, SMITH

1763–64.)[4]  The letter concluded:

> Based on the failure to provide requested documentation and the
> employer's other reason for your termination, your complaint is being
> screened out and your file is being closed by the Agency.

> If you disagree with the action of this Office, you have the right under
> Va. Code 40.1-51.2:2(B) to file an action in the Circuit Court against
> your employer for appropriate relief (copy attached).  The Department
> is not directly involved in the court procedure, if you choose to elect it.

(SMITH 1764.)[5]

## II.  ANALYSIS

### A.  Motion to Dismiss Whistleblower Claim for Lack of Subject Matter Jurisdiction

Under Virginia Code § 40.1-51.2:1, it is unlawful for an employer to "discharge or in any

way discriminate against an employee because the employee has filed a safety or health complaint

or has testified or otherwise acted to exercise rights under the safety and health provisions of this

title for themselves or others."  The statute has an administrative prerequisite:

> (A) Any employee who believes that he or she has been discharged or
> otherwise discriminated against by any such person in violation of §
> 40.1-51.2:1 may, within 60 days after such violation occurs, file a
> complaint with the Commissioner alleging such discharge or
> discrimination.  The employee shall be prohibited from seeking relief
> under this section if he fails to file such complaint within the 60-day
> time period . . . .

> (B)  Should the Commissioner, based on the results of his investigation
> of the complaint, *refuse to issue a charge against the person that*

---

[4]  APCO's motion to strike encompasses this document and other documents it claims were untimely disclosed, referred to by APCO as the Virginia Department of Occupational Safety and Health (VOSH) documents.  (Dkt. No. 33-13.)

[5] The filing of the whistleblower complaint was not disclosed to APCO until after Smith received this determination letter.

> *allegedly discriminated against the employee, the employee may bring*
> *action in a circuit court having jurisdiction over the person allegedly*
> *discriminating against the employee, for appropriate relief.*

Va. Code § 40.1-50.2:2 (emphasis added).  As noted above, Smith filed his administrative

complaint in April 2019, but he filed this lawsuit in federal court in October 2019, long before VA

DOLI completed its investigation and issued its determination letter in February 2021.  Therefore,

APCO argues that this claim should be dismissed for lack of jurisdiction because Smith failed to

exhaust his administrative remedies prior to filing suit.  *See Bass v. E.I. Dupont De Nemours & Co.*,

28 F. App'x 201, 205 (4th Cir. 2002) (affirming dismissal of  § 40.1-51.2:1 claim because plaintiff

"has not exhausted her administrative remedies"); *Reiterman v. Costco Wholesale Mgmt. No. 238*,

No. 5:05cv000012, 2005 WL 1800085, at *4 (W.D. Va. July 28, 2005) ("Rieterman's claim under

Va. Code § 40.1-51.2:1 fails because that statute requires a claimant to file a complaint with the

Commissioner of Labor and Industry within sixty days of the alleged discrimination as a

prerequisite to filing a complaint with the court, and there is no indication that Reiterman ever

exhausted her administrative remedies.").

The court's jurisdiction over this claim, if any, is supplemental to the federal causes of

action in this lawsuit.  *See* 28 U.S.C. § 1367.  It is unclear to the court if it may exercise jurisdiction

over a claim pursuant to Virginia Code § 40.1-51.2:1 when the lawsuit is filed before the issuance

of a determination letter pursuant to § 40.1-51.2:2, and the determination letter is then issued during

the pendency of the lawsuit – and, in this case, after a motion for summary judgment is filed.  Given

this uncertainty, the court will exercise its discretion to decline supplemental jurisdiction over this

claim.  *See* § 1367(c)(1), (4) (providing that a court may decline to exercise supplemental

jurisdiction when a claim "raises a novel or complex issue of State law" or when in "exceptional

circumstances, there are other compelling reasons for declining jurisdiction").  The claim will be

dismissed without prejudice.[6]

## B.  Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c), 56(e).  All inferences must be viewed in a light most favorable to the non-moving party, but the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

### 1.  FMLA

Smith alleges that APCO terminated him in retaliation for exercising his FMLA rights. (Compl. ¶¶ 63–73, Dkt. No. 1.)  Smith also alleges that APCO interfered with his rights under the

---

[6] APCO also moves to strike the VOSH documents as untimely disclosed, arguing that "Rule 37(c) of the Federal Rules of Civil Procedure bars Plaintiff from using the VOSH Documents as evidence that he exhausted his administrative remedies which are required to bring a claim under Va. Code § 40.1-51.2:1."  (Dkt. No. 35 at 5.)  Given the court's dismissal of the whistleblower claim, the motion to strike will be denied as moot.

FMLA.  (*Id.* ¶¶ 74–82.)  In response to APCO's motion for summary judgment, Smith gave notice that he is not pursuing the interference claim.  (Dkt. No. 33 at 2 n.2.)

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  "While the FMLA does not specifically forbid discharging an employee in retaliation for his use of FMLA leave, 29 C.F.R. § 825.220(c) states that employers are 'prohibited from discriminating against employees or prospective employees who have used FMLA leave' and that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.'"  *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294–95 (4th Cir. 2009).  Thus, courts have interpreted the FMLA to provide a cause of action for retaliation.  *Id.* at 295.

Plaintiff can succeed on a retaliation claim by either providing direct evidence of discrimination or by satisfying the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 n.4 (4th Cir. 2005).  Under the burden-shifting framework, to establish a prima facie case of FMLA retaliation, Smith must demonstrate that (1) he engaged in a protected activity, (2) his employer took an adverse employment action against him, and (3) there was a causal link between the two events.  *Hannah v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019).  If plaintiff establishes a prima facie case, the burden shifts to the employer to assert a "legitimate, nondiscriminatory reason" for its adverse employment action.  *Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006).  If the employer offers a non-discriminatory explanation for the adverse action, the plaintiff bears the burden of establishing that "the employer's proffered explanation is pretext for FMLA retaliation."  *Id.*  An employer is entitled to summary judgment on the issue of pretext if the

employee creates "only a weak issue of fact as to whether the employer's reason is untrue and there is abundant and uncontroverted evidence that no discrimination had occurred." *Carmon v. Dance*, No. 5:18-CV-433-D, 2021 WL 232121, at *7 (E.D.N.C. Jan. 22, 2021) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

Smith argues that he has raised an issue of fact as to the causal connection between his FMLA leave and termination because he was still on leave when he was terminated.  This argument makes little sense when viewed through the lens of APCO's extremely generous leave allowance pursuant to which Smith received twelve months of job-protected leave.  Plaintiff took FMLA leave on July 10, 2018, and he was still on leave when he was terminated in March of 2019, pursuant to APCO's leave policy and long after his FMLA leave had expired on October 1, 2018.  (Smith Dep. 233, 260.)  This timeline in no way suggests a causal link between Smith's FMLA leave and his termination.  *See Boue v. Mattis*, Civil Action No. 1:17cv505, 2018 WL 1863643, at *9 (E.D. Va. 2018) ("Plaintiff cannot rely on temporal proximity alone because nearly six months passed" between the protected activity and the adverse employment action).

Setting aside the complete lack of evidence connecting Smith's termination to his FMLA leave, APCO has supplied a non-discriminatory reason for Smith's termination, and Smith offers no evidence of pretext.  The lengthy series of letters from Smith and his wife containing harassing language and unfounded accusations, with the backdrop that Smith never seemed able to move on from certain issues, are what led to Smith's termination, not Smith's medical leave.  Significantly, these letters started shortly before Smith took FMLA leave in July 2018 and continued for the duration of Smith's medical leave.  As Chambers testified, Smith was "headed for termination.  We were going to terminate him regardless . . . he was a disruptive worker, a disruptive person in the work force.  He created a hostile environment, and he was harassing our employees to the point

24

where we had people telling us that they were going to quit their jobs if he came back." (Chambers Dep. 42.)

For these reasons, the court will grant summary judgment on Smith's FMLA claims.

**2. ADA discrimination and retaliation**

For his discrimination claim, Smith must prove that (1) he is disabled, (2) he is a qualified individual, and (3) he suffered an adverse employment action based on his disability. *Laird v. Fairfax Cnty., Va.*, 978 F.3d 887, 892 n.4 (4th Cir. 2020). For his retaliation claim, Smith must prove that (1) he has engaged in protected conduct, (2) he suffered an adverse action after engaging in the protected conduct, and (3) there was a causal link between the protected conduct and the adverse action. *Id.* In either instance, Smith must show that (1) he is protected, (2) he suffered an adverse action, and (3) there is a causal link between his protected status and the adverse action. *Id.*

Regarding a causal connection, Smith argues that there has been a "cause and effect relationship" between Smith's use of leave and adverse actions, including the failure to promote and/or to relocate Smith based on various positions for which he applied. (Dkt. No. 33 at 24.) Smith cites no evidence to support this assertion. Instead, Smith cites his own deposition testimony that any time he took leave he "experienced a lot of push-back"; that he has had "personal experience that sometimes they are not in a hurry for you to get back to work"; and during his last medical leave, Edwards often called Smith to ask why he was off work. (*See id.*) This evidence does not suggest a causal connection between Smith's alleged disability or protected activities and any adverse employment action.

Interestingly, Smith does not seem to be arguing that his termination had anything to do with his alleged disability. This strategy presumes that Smith suffered an adverse employment action aside from his termination, but Smith offers no explanation or argument in that regard. "For a

discrimination claim, the plaintiff must show that her employer took an action that adversely 'affected employment or altered the conditions of the workplace.'" *Laird*, 978 F.3d at 893 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006)); *see also id.* (explaining that plaintiffs are "not so limited" for a retaliation claim, but the alleged retaliatory action must be "materially adverse," meaning that the plaintiff must show that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"). Smith fails to create an issue of fact as to whether any action taken by APCO—aside from firing him—satisfies these standards. For example, Smith cites an exhibit that includes emails submitted by Smith applying for various jobs at AEP, including Safety Coordinator, Customer Services Account Representative, and Meter Laboratory Supervisor. (Dkt. No. 33-35.) The court has no information from which it can discern that the refusal to place Smith in any of these jobs resulted in a "significant detriment" to Smith. *Laird*, 978 F.3d at 893 (noting that the inquiry requires a "fact-specific analysis that depends on the particular circumstances of the case").

To the extent that Smith still maintains that he was fired because of his alleged disability,[7] or in retaliation for any protected activity related to his disability,[8] APCO is entitled to summary judgment for the reasons set forth above: APCO has supplied a non-discriminatory reason for Smith's termination, and Smith offers no evidence of pretext. The following testimony adequately summarizes the reasons for Smith's termination:

> Smith was terminated because his incessant and repeated complaints about the same things over and over again became an enormous distraction to the company's operations, and then when he and his wife

---

[7] Smith identifies his disabilities as degenerative shoulder and back issues, anxiety, and depression. (Compl. 85.) APCO does not concede that Smith is disabled within the meaning of the ADA. The court makes no finding in this regard.

[8] APCO does not concede that Smith engaged in protected activity within the meaning of the ADA. The court makes no finding in this regard.

began attacking other APCO employees—people he didn't even work with—his conduct created a hostile environment for other employees. It got to the point that they were seeking transfers or indicating they needed to get their own personal lawyers for protection against his accusations. He simply could not let things go, and he could not move on. For example, over the years, he continued to repeat the same concerns with the Volvo situation multiple times to multiple people. There was nothing more that could be said about that situation. And when he didn't get answers to his repeated complaints that were satisfactory to him, he lashed out at the Company, calling it 'corrupt' and full of conflicts of interests, and he lashed out personally at his co-workers. And he did it again and again and again. Chris Beam and I warned Smith about 'moving on' back in 2017, but Smith never could seem to get over his issues, even after they were looked into and addressed with him multiple times. We go to the point where we realized that nothing was ever going to change over time, and we simply could not tolerate it any longer. We were more than patient with Smith, but at some point even the most patient employer reaches the end of the line. That's where we were when we made the decision to terminate Smith.

(Wilson Decl. ¶ 68.)

Mr. Smith was terminated because, again, he made numerous allegations; they were fully and independently investigated each time . . . . [T]hey were determined to be of no substance. He would not let those go. He would continue to complain . . . . [T]here were letters written with the same complaints that were completely investigated, and it really became a fact that we were tying up huge amounts of resources and spending huge amounts of time investigating the same issues over and over again, and that wasn't good enough for him . . . and then he started to . . . take shots at his fellow employees and disrupting the work environment to the point where we felt like it was a hostile work environment and we needed to get rid of Mr. Smith.

(Chambers Dep. 32–33.) Again, Smith offers no evidence that the well-documented and supported reasons for his termination were pretextual. Therefore, APCO is entitled to summary judgment on these ADA claims.

### 3. ADA failure to accommodate

The ADA provides a cause of action to a qualified individual with a disability whose

employer fails to make a reasonable accommodation to a known physical or mental limitation unless the employer can demonstrate that the requested accommodation would impose an undue hardship.  42 U.S.C. § 12112(b)(5)(A).  The elements of a failure to accommodate claim are that (1) the employee is a qualified individual with a disability, (2) the employer has notice of the employee's disability and request for accommodation, and (3) the employer fails to accommodate the employee.  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 579–80 (4th Cir. 2015).  A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  In other words, a qualified individual is one who can perform the basic requirements of their job if given a reasonable accommodation.  *Schack v. Parallon Enters., LLC*, Civil Action No. 7:19cv00767, 2021 WL 424428, at \*5 (W.D. Va. Feb. 8, 2021).

As noted above, APCO argues that Smith is not disabled within the meaning of the ADA. Assuming, without deciding, that Smith meets the disability definition, Smith is not a qualified individual because his shoulder injury and restrictions associated with his surgery precluded Smith from performing the essential functions of a line worker, such as pole climbing.  "Employees whose restrictions require the elimination or reallocation of essential job functions are not qualified individuals with a disability."  *Klik v. Verizon Va. Inc.*, CIVIL NO. 6:15-CV-00002, 2016 WL 917499, at \*5 (W.D. Va. Mar. 8, 2016) (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400–01 (2002)) (finding that an employee was not a qualified individual because he "could not lift his own body weight out of a manhole when performing underground work" or "carry a 28-foot ladder"); *see also Griffin v. Holder*, 972 F. Supp. 2d 827, 848 (D.S.C. 2013) (quoting *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011) ("A reasonable accommodation 'does not require an employer to reallocate essential job functions or assign an employee permanent

28

light duty.'").  Finally, APCO provided Smith with a reasonable accommodation: unlimited paid

leave while he recovered from shoulder surgery.  *See Wilson v. Dollar Gen. Corp.*, 717 F.3d 337,

345 (4th Cir. 2013) (Reasonable accommodation may comprise "the use of accrued paid leave or

providing additional unpaid leave for necessary treatment") (quoting 29 C.F.R. § 1630.2(o)).  Smith

desired accommodation in the form of various light duty assignments, but an employer "may

reasonably accommodate an employee without providing the exact accommodation that the

employee requested."  *Hannah*, 916 F.3d at 338.

For these reasons, APCO is entitled to summary judgment on Smith's accommodation

claim.

### 4.  State law claims for intentional and negligent infliction of emotional distress

To succeed on a claim for intentional infliction of emotional distress, Smith must show that

APCO's conduct was (1) intentional, (2) extreme and outrageous, (3) caused him emotional

distress, and (4) resulted in emotional distress that was severe.  *Supervalu, Inc. v. Johnson*, 666

S.E.2d 335, 343 (Va. 2008).  This tort's elements present a "high standard to meet."  *Fuller v.*

*Carilion Clinic*, 382 F. Supp. 3d 475, 505 (W.D. Va. 2019).  "A primary reason for the tort's

disfavored status is that because the prohibited conduct cannot be defined objectively, clear

guidance is lacking, both to those wishing to avoid committing the tort, and to those who must

evaluate whether certain alleged conduct satisfies all elements of the tort."  *Almy v. Grisham*, 639

S.E.2d 182, 189 (Va. 2007).

The court agrees with APCO that the record evidence does not create a triable issue on this

claim.  Smith explains that he suffered emotional distress due to his job, claiming that he was

diagnosed with PTSD and adjustment disorder with anxiety/depression.  The court is sympathetic to

job-related stress, but viewing the evidence in the light most favorable to Smith, none of the

conduct at issue in this case remotely approaches the standard of "extreme and outrageous."  Far

worse conduct has been found not to meet this standard, particularly in the workplace context.  *See*

*Spencer v. Town of Bedford*, Case No. 6:18-cv-31, 2018 WL 5983572, at *9 (W.D. Va. Nov. 2,

2018); *Harris v. Kreutzer*, 624 S.E.2d 24, 33–34 (Va. 2006) (holding that plaintiff's allegations that

her employer verbally abused her, raised her voice to her, caused her to break down into tears, and

accused her of being a faker and malingerer did not satisfy the extreme and outrageous element);

*Campbell v. Logans Roadhouse, Inc.*, No. 04-481, 2005 WL 1668052, at *1–2 (E.D. Va. June 21,

2005) (holding that plaintiff's allegations that her supervisor was rude to her, reprimanded her and

disciplined her unfairly, and reduced her working hours did not satisfy the extreme and outrageous

element); *Simmons v. Norfolk & W. R.R. Co.*, 734 F. Supp. 230, 232 (W.D. Va. 1990) (holding that

plaintiff's allegations that his employer "cursed and screamed at him in public" and "continually

ordered him from job to job to the accompaniment of cursing and shouting" did not satisfy the

extreme and outrageous element); *see id.* (stating that a stringent standard for intentional infliction

of emotional distress is particularly applicable to disputes in the workplace).

To succeed on a claim for negligent infliction of emotional distress, a plaintiff must prove

(1) physical injury (2) proximately caused (3) by negligent conduct (4) wantonly inflicted by

defendants (5) upon plaintiff.  *Guerrero v. Deane*, No. 1:09cv1313 (JCC/TRJ), 2010 WL 670089, at

*16 (E.D. Va. Feb. 19, 2010).  "The standard for negligent infliction of emotional distress is even

more rigorous than the standard for intentional infliction of emotional distress."  *Michael v. Sentara*

*Health Sys.*, 939 F. Supp. 1220, 1234 (E.D. Va. 1996).  A plaintiff must "sufficiently allege a 'clear

and unbroken chain of causal connection' between a physical injury which 'was the natural result of

fright or shock proximately caused by the defendant's negligence.'"  *Lucas v. Henrico Cnty. Sch.*

*Bd.*, 822 F. Supp. 2d 589, 609 (E.D. Va. 2011) (quoting *Delk v. Columbia/HCA Healthcare Corp.*,

523 S.E.2d 826, 834 (Va. 2000)).

Smith has failed to create an issue of fact as to any of these elements.  Once again, Smith cites his mental health diagnosis, but he has not established that there was a physical injury proximately caused by APCO's negligence.  Moreover, in Virginia, there is "'no duty of reasonable care imposed upon an employer in the supervision of its employees.'"  *Gastyne v. Entrust, Inc.*, No. 1:10cv271 (JCC), 2010 WL 3418235, at *8 (E.D. Va. Aug. 24, 2010) (quoting *Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 365 S.E.2d 751, 754 (Va. 1988)).  In the absence of a legal duty of care, there can be no cause of action grounded in negligence.  *See Dowdy*, 365 S.E.2d at 754 (holding that, even when employer knew of plaintiff's depression and when their actions aggravated that depression, defendants owed no duty to plaintiff that would support a negligence claim).

## III.  CONCLUSION

For the foregoing reasons, the court will, in its discretion, not exercise jurisdiction over the state law whistleblower claim and dismiss it, and the court will grant summary judgment to APCO as to the remaining claims.  An appropriate order will be issued.

Entered: April 14, 2021.

/s/ Elizabeth K. Dillon
    Elizabeth K. Dillon
    United States District Judge